DECISION AND JUDGMENT ENTRY
{¶ 1} Kennedie Jackson, a minor, by and through her parent and guardian, Merisa Jackson, and Merisa Jackson individually, appeal the judgment of the Lucas County Court of Common Pleas. Appellants alleged in their complaint that Robert T. DeRosa, *Page 2 
M.D., was negligent in delivering Kennedie at birth and that, as a result, Kennedie suffered a delivery complication known as "shoulder dystocia," a brachial plexus injury, and permanent nerve damage. They further alleged that Sunforest OB-GYN Associates, Inc. was liable for the damages caused by DeRosa pursuant to the doctrine of respondeat superior.
 {¶ 2} A jury entered a verdict for appellees, finding that DeRosa did not act negligently. The jury did not reach the issue of causation. Appellants timely appealed the jury's verdict and now assign two errors for review:
 {¶ 3} "The trial court erred in permitting defense experts to offer testimony that was not stated to a reasonable degree of medical probability.
 {¶ 4} "The trial court erred in refusing the strike prospective jurors for cause despite their admissions of bias in favor of defendants-appellees."
 {¶ 5} In their second assignment of error, appellants argues that prejudice resulted when the trial court refused to strike for cause two allegedly biased jurors because it deprived her of preemptory challenges. Appellants rely on R.C. 2313.42, which lists good causes for principles challenges. They specifically point to section (J), which allows the striking of a venireperson for cause if the court determines "[t]hat he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." When a trial court finds facts supporting a challenge under sections (A) through (I), the result is "absolute disqualification" and the court may not rehabilitate the potential juror. Hall v. Banc OneMgt. Corp., 114 Ohio St.3d 484, *Page 3 2007-Ohio-4640, ¶ 33. A challenge raised under section (J), however, permits the court to exercise discretion and allow rehabilitation. The decision to do so may not be reversed absent an abuse of discretion.Hall, supra, ¶ 38; Berk v. Matthews (1990), 53 Ohio St.3d 161, syllabus.
 {¶ 6} Appellants also rely on R.C. 2313.43, which states:
 {¶ 7} "In addition to the causes listed under section 2313.42 of the Revised Code, any petit juror may be challenged on suspicion of prejudice against or partiality for either party, or for want of a competent knowledge of the English language, or other cause that may render him at the time an unsuitable juror. The validity of such challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased." (Emphasis added.)
 {¶ 8} An erroneous denial of a principle challenge for cause may be prejudicial because it forces a party to use its peremptory challenges, leaving them fewer peremptory challenges to use for other potential jurors. State v. Williams (1997), 79 Ohio St.3d 1, 8. The trial court has the benefit of observing the prospective jurors' demeanor and nonverbal characteristics, which are important factors in weighing potential bias, prejudice, and sincerity. Berk, 53 Ohio St.3d at 169. Reversal is only appropriate when the trial court acted in an unreasonable, arbitrary, or unconscionable manner. Id.
 {¶ 9} Appellants specifically claim it was error not to strike potential jurors Mr. Start and Mr. Ludwig. Mr. Start is a semi-retired pharmacist who acknowledged that he has relatives involved in the legal profession and has a "dim view" of lawsuits and a long- *Page 4 
standing bias in favor of the medical profession. After further questioning, he claimed to be a fair person, that he would listen to all evidence before making a determination and would not let his medical background influence him. The relevant questions and answers were given as follows:
 {¶ 10} "Mr. Kulwicki [appellants' counsel asking about views on medical negligence and tort reform]: * * * Mr. Start, what are your feelings about the topic?
 {¶ 11} "Mr. Start: Well, since I'm involved — you know, I've had relatives involved in the profession and I'm in the medical profession, I'm aware of lawsuits. I read in our journals the lawsuits that are being pursued against our profession and so forth, so I, you know, I obviously take a dim view of it.
 {¶ 12} "Mr. Kulwicki: Tell me how your dim view might affect you in this particular case.
 {¶ 13} "Mr. Start: Well, here, again, you think you can balance the evidence, but I know that I am — I would, you know, I mean — you know — I think I would probably go more towards the medical profession * * * as a whole.
 {¶ 14} "Mr. Kulwicki: Understandable, understandable. And I assume you've had enough experience and thought about this enough, we've been talking now for a couple hours, to hold those opinions fairly strongly. These are views that you've had for a while and are pretty certain of?
 {¶ 15} "Mr. Start: Yeah, sure. *Page 5 
 {¶ 16} "Mr. Kulwicki: And I would expect you to hold yourself out as a fair person, but in this issue you have some fair opinions.
 {¶ 17} "Mr. Start: * * * Yes.
 {¶ 18} "* * *
 {¶ 19} "Mr. Wasung [appellee's counsel]: * * * Mr. Start, first of all, you said you come in with a view that you're not a doctor, but you work with doctors, and you keep track of things about lawsuits. Do you think that overwhelms your ability to sit and listen and apply the law as the Judge indicates, and reason through the evidence that you hear in this case?
 {¶ 20} "Mr. Start: No.
 {¶ 21} "Mr. Wasung: Do you feel that you are here to waylay the plaintiff in this case and hide out and wait, no matter what the evidence is, and make a decision for the doctor?
 {¶ 22} "Mr. Start: No, it is not that. No, not at all, not that strong.
 {¶ 23} "Ms. Lee [another potential juror after inquiry about whether he could be fair and impartial]: I'm going to listen, I'm going to be fair and impartial and I'm going to be objective.
 {¶ 24} "Mr. Wasung: Mr. Start, do you feel that same way?
 {¶ 25} "Mr. Start: Sure. Yes."
 {¶ 26} Appellants also challenged potential juror Mr. Ludwig because his wife is a nursing supervisor at Flower Hospital, and he stated in voir dire that he may favor the *Page 6 
doctor because of his wife's profession. After further questioning by appellees, however, he asserted five different times that he was fair, reasonable, and would be able to set aside his feelings and decide the case based on the evidence. The relevant voir dire proceeded as follows:
 {¶ 27} "Mr. Kulwicki: And in terms of this lawsuit here, any thoughts that that [sic] may affect your decision making or how you view the evidence or whose side you might have a tendency to be on before we even get started?
 {¶ 28} "Mr. Ludwig: I could be up in the air. I mean, I need to hear both sides, but coming from the position I'm coming from and knowing the things that I'm coming from, it could lean me more one way than the other.
 {¶ 29} "Mr. Kulwicki: And which way do you have a tendency to lean?
 {¶ 30} "Mr. Ludwig: Probably maybe towards the doctor.
 {¶ 31} "Mr. Kulwicki: * * * [S]eems like maybe what you're telling me is you may have a tendency to be more forgiving than the average juror of a big mistake; is that fair?
 {¶ 32} "Mr. Ludwig: Yes, that's fair. I mean, I grew up on a farm, so we've had, you know, we've birthed many animals and things like that, and I know what the process is and everything else. So, I mean, to me some of it is the cycle of life, too.
 {¶ 33} "Mr. Kulwicki: * * * I think what you're telling me is you suspect in your own self that you might have a tendency to lean towards the defense; is that fair to say?
 {¶ 34} "Mr. Ludwig: Yes. *Page 7 
 {¶ 35} "Mr. Kulwicki: * * * You hold these opinions pretty strongly. Are these view that you've though about for some time?
 {¶ 36} "Mr. Ludwig: Yeah, these are views that I've thought about.
 {¶ 37} "Mr. Wasung: Mr. Ludwig, I think you said at one point, I think, maybe, I'm not sure: I have a tendency, I trust doctors. I'm not sure exactly of the wording. The question is: Do you think you are reasonable individual?
 {¶ 38} "Mr. Ludwig: Yes, I'm reasonable.
 {¶ 39} "Mr. Wasung: Are you a fair individual?
 {¶ 40} "Mr. Ludwig: Yes.
 {¶ 41} "Mr. Wasung: * * * Do you feel you can set aside whatever feelings you have with regard to doctors and whatever feelings you have with regard to children, set them aside and decide on the evidence that you hear in this case?
 {¶ 42} "Mr. Ludwig: Yes.
 {¶ 43} "Mr. Wasung: Do you think you can listen to the evidence, apply the law the Judge gives you with the rest of the jury — because you all have to do this — make a reasonable determination based upon the evidence and the law in this case?
 {¶ 44} "Mr. Ludwig: Yes, I do.
 {¶ 45} "Mr. Wasung: Do you think you are going to be unable to do that because of any feelings that you have about kids or about doctors or any of the rest of your background?
 {¶ 46} "Mr. Ludwig: No." *Page 8 
 {¶ 47} Ludwig and Start both stated they had potential biases for the medical profession, but they both made it clear that they could set those beliefs aside and make a fair determination in this case. Further, both Ludwig and Start were asked by defense counsel whether they had children and whether this would influence their ability to make a fair determination, since the injured plaintiff was a child. Both indicated that they have children and they both stated that this would not influence them in their decision-making.
 {¶ 48} Hinkle v. Cleveland Clinic Found., 159 Ohio App.3d 351,2004-Ohio-6853, ¶ 16-17, appeal dismissed by 108 Ohio St.3d 1209,2006-Ohio-551, is closely analogous to this case. In Hinkle, two prospective jurors admitted to having a relationship with and bias for the Cleveland Clinic. However, the finding that both individuals were rehabilitated during their questioning was affirmed on appeal because no abuse of discretion was found. Id. at ¶ 17. Like the jurors inHinkle, neither Ludwig nor Start had a personal relationship with the defendant doctor or another doctor in the clinic, and they had been sufficiently rehabilitated.
 {¶ 49} Appellants further argue that substantial prejudice resulted because they used their peremptory challenges on Ludwig and Start instead of on jurors who actually had doctor-patient or working relationships with appellees. Potential juror Ms. Copeland had expressed substantial bias in favor of appellees because her doctor works for Sunforest. She stated she would be uncomfortable finding against the group. Appellees, however, struck Ms. Copeland as an alternate juror so no prejudice to appellants resulted. Potential jurors Ms. Lee, Ms. Gasiorski, and Ms. Clay had affiliations with other doctors *Page 9 
at Sunforest. Ms. Lee, a patient of Dr. Judis of Sunforest, stated she had no association with the other doctors, including Dr. DeRosa. She repeatedly stated that she would be fair and impartial. Ms. Gasiorski stated her OB-GYN used to be a member of Sunforest and her sister's OB-GYN works for Sunforest. She only met Dr. Bishop from Sunforest once and stated that she did not form any opinions about his character during the meeting. Ms. Clay works with doctors on a regular basis. Ms. Clay was an alternate juror and appellants had an opportunity to use a preemptive strike against her but declined to do so. Each of these potential jurors, while admitting to a tenuous relationship, denied any possible bias.
 {¶ 50} Appellants cite State v. Midwest Pride IV, Inc. (1998),131 Ohio App.3d 1, for their proposition that "[a] person called as a juror in a criminal case who clearly shows himself, on his voir dire, not to be impartial between the parties, is not rendered competent by saying that he believes himself able to render an impartial verdict." Id. at 20, citing Palmer v. State (1885), 42 Ohio St. 596, paragraph three of the syllabus. The holding in Palmer, however, was confined to cases where a potential juror had formed a strong opinion regarding the guilt or innocence of a particular defendant based on newspaper coverage or other exposures to the case. The interpretation of the impartiality rule was stated thusly: "The true spirit and meaning of this statute is that notwithstanding an opinion formed or expressed by the juror, if he believe himself to be impartial and able to render a verdict according to the evidence, the court being satisfied of his impartiality, he may be admitted as a competent juror to try the case." Palmer,42 Ohio St. at 605. The *Page 10 
juror at issue, however, had stated that "he had formed and expressed an opinion as to the guilt or innocence of the accused, that his opinion had been formed from the reading of the testimony of witnesses in the case and the reading what purported to be a confession of the accused. That if sworn as a juror he would take his opinion into the jury box, and that the opinion would remain the same until it was changed by testimony, and that it would require strong testimony from the accused to change his opinion; and that he would, as such juror, be governed by his opinion until it was so changed." Id. at 604. This rule was applied in Midwest Pride IV, Inc., because, as in Palmer, the challenged jurors had expressed a bias toward the particular defendant. Such is not the case with potential jurors Start and Ludwig, who did not express any foreknowledge of the particular case. These potential jurors are more akin to the potential jurors in Lindsay v. State (1903),69 Ohio St. 215, and McHugh v. State (1884), 42 Ohio St. 154, objections to whom were overruled because they had not formed any bias toward the particular defendant and were sufficiently rehabilitated.
 {¶ 51} On review of the voir dire, we find no abuse of discretion in the trial court's refusal to strike jurors Ludwig and Start for cause pursuant to R.C. 2313.42(J) and 2313.43. Appellants' second assignment of error is therefore not well-taken.
 {¶ 52} Next, appellants argue that the testimony of appellees' expert, Dr. Cetrulo, should not have been admitted because he could not state his opinion regarding the cause of Kennedie's injury to a reasonable degree of medical certainty, citing Stinson v. England (1994),69 Ohio St.3d 451, and Patton v. Cleveland (1994), 95 Ohio App.3d 21. *Page 11 
The relevant testimony to which appellants objected was given on direct examination as follows:
 {¶ 53} "Q. Doctor, how is it that the standard of care can be met and unfortunately, Kennedie Jackson still end up with a brachial plexus injury?
 {¶ 54} "[Appellants' counsel]: Your Honor, I'm going to object. It's not stated to a medical degree of medical probability.
 {¶ 55} "Q. Doctor, I asked earlier, but I'll ask again for this question: Do you have an opinion within a reasonable degree of medical certainty or probability as to how this child could end up with a brachial plexus injury if the standard of care had been met?
 {¶ 56} "[Appellants' counsel]: Objection. The word could is in there.
 {¶ 57} "THE COURT: Read the question back to me, would you?
 {¶ 58} "[Appellees' counsel]: I'll rephrase it, Your Honor.
 {¶ 59} "THE COURT: Question is withdrawn.
 {¶ 60} "Q. Doctor, I'm going to ask that you express all of your opinions within a reasonable degree of medical certainty as I asked you before.
 {¶ 61} "A. Yes, I understand that.
 {¶ 62} "Q. Doctor, what I would like you to tell us now is do you have an opinion as to how the standard of care was met, yet this child Kennedie Jackson still ended up with a brachial plexus injury?
 {¶ 63} "A. Well, we know that even when you do all of the maneuvers appropriately and carefully and within acceptable standards of care, you still sometimes *Page 12 
will end up with a brachial plexus injury and the reasons for that are the following: number one, just having the shoulder dystocia and not doing anything and having that resolve on its own can result in a baby with a brachial plexus injury. We know that certain positions that the baby might be in utero even before a baby starts can injure the nerves in the neck. We also know that the normal expulsive forces of labor cause brachial plexus injuries where there is no dystocia, where you have the normal expulsive forces of labor which make that baby come out even without the mother pushing can also cause that.
 {¶ 64} "What I feel certain about is that nothing that Dr. DeRosa did or failed to do caused this to happen, that if you think about it, there are other reasons and other causes for that which are well documented in the medical literature."
 {¶ 65} Appellees argue (1) Dr. Cetrulo only testified that Dr. DeRosa's actions did not cause the injury, but did not identify a cause, and (2) that because the jury found no breach of duty and did not reach the issue of causation, any error in admitting the testimony was harmless. We do not reach the first argument, as we find appellees' second argument has merit and it is dispositive of the claimed error.
 {¶ 66} "Decisions regarding the admissibility of evidence are within the broad discretion of the trial court. State v. Hymore (1967),9 Ohio St.2d 122. A decision to admit or exclude evidence will be upheld absent an abuse of discretion. O'Brien v. Angley (1980), 63 Ohio St.2d 159. Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the *Page 13 
adverse party or is inconsistent with substantial justice. Id."Beard v. Meridia Huron Hosp., 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20.
 {¶ 67} "A court's error may be considered harmless only if it does not affect the substantial rights of the parties. Civ.R. 61. `Generally, in order to find that substantial justice has been done to an appellant so as to prevent the reversal of a judgment for errors occurring at trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision.' Hallworth v. Republic Steel Corp. (1950), 153 Ohio St. 349."Cappara v. Shibley (1999), 85 Ohio St.3d 403, 408.
 {¶ 68} The jury determined that Dr. DeRosa did not breach the standard of care and did not reach the issue of causation. The above testimony was given only after Dr. Cetrulo testified to the relevant standard of care and his opinion that Dr. DeRosa met that standard. Dr. Cetrulo stated his opinion regarding the standard of care whether Dr. DeRosa comported with that standard to a reasonable degree of medical certainty. Regarding causation, he did not attempt to pinpoint a specific alternative probable cause. Rather, he stated to a reasonable degree of medical certainty that Dr. DeRosa's actions were not the cause of the injury. Testimony regarding other possible causes, when it does not propose one cause as the actual proximate cause or a probable cause, has been held admissible in similar cases even where those opinions are not stated to a reasonable degree of medical certainty. Wasmire v.O'Dear, 5th Dist. No. 2005CA00319, 2007-Ohio-736, applying Stinson v.England (1994), 69 Ohio St.3d 451. *Page 14 
 {¶ 69} Moreover, because the jury did not reach the issue of causation, any error which may possibly have occurred in allowing Dr. Cetrulo to testify to possible alternative causes of appellant's injury had no prejudicial effect and must be, therefore, harmless error. Appellants' first assignment of error is therefore not well-taken.
 {¶ 70} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J. CONCUR. *Page 1